**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PAUL REHBERGER, individually and** | ) | |
| **on behalf of all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-0085** |
| | ) | **Judge Trauger** |
| **HONEYWELL INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Motion to Dismiss and to Strike Class Allegations filed by the defendant (Docket No. 13), to which the plaintiff has filed a response (Docket No. 38). For the reasons discussed below, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

The plaintiff, Paul Rehberger, is a New Jersey resident who installed an air cleaner manufactured by the defendant, Honeywell International, Inc. ("Honeywell"), in his home.[1] He alleges that the air cleaner emitted excessive amounts of ozone, causing him and his family to suffer respiratory problems.

Specifically, in 2005, the plaintiff purchased and installed an F50F model air cleaner. He selected that model because the filter consisted of removable and reusable "cells." After running the unit, the plaintiff and his family noticed a strange odor, which they attributed to the house.

---

[1] Unless otherwise noted, the allegations are drawn from the plaintiff's Complaint (Docket No. 1).

They also began to suffer various respiratory illnesses.  In 2010, the plaintiff discovered that, if he ran the F50F without the removable cells, the odor disappeared.  Since then, the plaintiff has used a paper filter in the F50F, and his family's health issues have allegedly subsided.

The F50F is packaged with a product data sheet that states that the air cleaner produces between 5 and 10 ppb of ozone; these numbers are repeated in the F50F owner's guide.  The plaintiff alleges that, in reality, the F50F generates indoor ozone concentrations of between 25 and 50 ppb.[2]  He further alleges that ozone exposure has been consistently linked with the types of illnesses his family suffered.  The product data sheet notes that the U.S. Food and Drug Administration recommends that indoor ozone concentration should not exceed 50 ppb.

The plaintiff has asserted a number of claims: (1) violation of the New Jersey Consumer Fraud Act; (2) fraudulent concealment; (3) fraud; (4) negligent misrepresentation; (5) breach of express warranty; (6) breach of implied warranty; (7) violation of the Magnuson-Moss Warranty Act; and (8) unjust enrichment.  The gravamen of each claim is that, had the plaintiff known of the F50F's true ozone emission levels, he would not have bought it.  The plaintiff also seeks to assert these claims on behalf of a class of "all persons in the United States who have purchased Honeywell F300 and F50F Series Electronic Air Cleaners."[3]  (Docket No. 1 ¶ 69.)

The plaintiff initially filed this suit on November 4, 2010 in the United States District Court for the District of New Jersey.  On January 28, 2011, the parties consented to an Order

---

[2] This allegation is based on a study performed by the magazine *Consumer Reports*.

[3] The F300 is identical to the F50F, except for the external housing.

transferring the case to this court, pursuant to 28 U.S.C. § 1404(a).[4]  (Docket No. 24.)  The

defendant has now filed a Motion to Dismiss and to Strike Class Allegations, pursuant to Federal

Rule of Civil Procedure 12.

## ANALYSIS

### I.    Motion to Dismiss Standard

The Federal Rules of Civil Procedure require plaintiffs to provide "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed R. Civ. P. 8(a)(2).  In

deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court will

"construe the complaint in the light most favorable to the plaintiff, accept its allegations as true,

and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487 F.3d

471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The court

must assume that all of the factual allegations are true, even if they are doubtful in fact.  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In contrast, legal conclusions are not

entitled to the assumption of truth.  *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950 (2009).

Generally, a complaint does not need to contain "detailed factual allegations," although

its allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*,

---

[4] A similar putative class action, involving ozone emitted by Honeywell's F300 air
cleaner, was previously filed in this district by the instant plaintiff's counsel.  (*Bearden v.
Honeywell Int'l, Inc.*, Case No. 3:09-01035.)  The *Bearden* case is still pending before this court,
and the court has issued three opinions in response to motions to dismiss or to strike filed by the
defendant.  *Bearden v. Honeywell Int'l, Inc.*, No. 3:09-1035, 2010 U.S. Dist. LEXIS 28331
(M.D. Tenn. Mar. 24, 2010) ("*Bearden I*"); *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d
932 (M.D. Tenn. 2010) ("*Bearden II*"); *Bearden v. Honeywell Int'l, Inc.*, No. 3:09-1035, 2010
U.S. Dist. LEXIS 83996 (M.D. Tenn. Aug. 16, 2010) ("*Bearden III*").

550 U.S. at 555. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555, 556 n.3. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). The factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-50. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

## II.     Application of the New Jersey Product Liability Act

First, the defendant argues that the New Jersey Product Liability Act ("PLA" or the "Act"), N.J. Stat. Ann. § 2A:58C-1 *et seq.*, subsumes all of the plaintiff's claims, with the exception of the express warranty claim and the Magnuson-Moss Warranty Act claim. (Docket No. 13, Ex. 1 at 7-10.)

The plaintiff has asserted several common-law fraud claims, as well as a claim under the New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. § 56:8-1 *et seq.*[5] The plaintiff alleges that Honeywell affirmatively misrepresented the amount of ozone produced by the F50F and omitted material information regarding the health effects of ozone, causing him to purchase an air cleaner that he otherwise would not have purchased.[6]

---

[5] The CFA prohibits the use of "any . . . misrepresentation, or the knowing . . . omission of any material fact with intent that others rely upon such . . . omission, in connection with the sale or advertisement of any merchandise . . . , whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

[6] The plaintiff's breach of warranty and unjust enrichment claims are premised on the same conduct. (Docket No. 1 ¶¶ 144-54, 163-68.)

The defendant argues that these claims must be brought under the PLA instead.  The PLA provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

*Id.* § 2A:58C-2.  The Act defines "product liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty."  *Id.* § 2A:58C-1(b)(3).  It further defines "harm" as "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from [these] type[s] of harm."  *Id.* § 2A:58C-1(b)(2).

The New Jersey Supreme Court has stated that, in enacting the PLA, the New Jersey legislature created "'one unified, statutorily defined theory of recovery for harm caused by a product.'"  *In re Lead Paint Litigation*, 924 A.2d 484, 503 (N.J. 2007) (quoting William A. Dreier *et al.*, *New Jersey Products Liability & Toxic Torts Law* § 1:2-1 (2007)).  "The [PLA's] language . . . is both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other products."  *Id.*  Thus, the PLA provides the exclusive vehicle for products liability claims, and a plaintiff may not recast such claims as

arising under the common law or under some other statute. *Id.* at 503-04; *Sinclair v. Merck & Co., Inc.*, 948 A.2d 587, 595-96 (N.J. 2008). The defendant argues that this requires the dismissal of most of the plaintiff's claims, because the plaintiff has alleged that the F50F caused him and his family to suffer health problems.

But the plaintiff correctly points out that, in this suit, he is not seeking to recover damages for personal injuries caused by the air cleaner. (Docket No. 38 at 5-7.) Instead, his claims are premised on the contention that, if Honeywell had disclosed the true amount of ozone created by the F50F and the attendant potential health hazards, he would not have purchased the product. He seeks economic damages relating to that purchase; he does not seek to recover damages stemming from physical injuries or property damage caused by the F50F's ozone output.[7]

Thus, the plaintiff's claims are not "product liability" claims, as defined by the PLA, because he is not seeking to recover for "harm caused by [the] product." N.J. Stat. Ann. § 2A:58C-1(b)(3). Here, the relevant harm was the plaintiff's decision to purchase the F50F, which was caused by the defendant's alleged misrepresentations and omissions, not by the product. Indeed, this harm occurred before the plaintiff ever operated the air cleaner. Because the plaintiff has not asserted any "product liability" claims, his claims are not subsumed by the PLA. *Cf. Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 517 (D.N.J. 2002) (finding that a

---

[7] It is true that the plaintiff *did* allegedly suffer personal injuries from ozone emitted by the air cleaner. But this fact is not necessary to the viability of the plaintiff's claims. The relevant harm – that is, the decision to purchase the F50F – would have occurred regardless of whether the plaintiff eventually fell ill.

fraud claim was subsumed by the PLA when the plaintiff conceded "that her 'claim is indeed based on the assertion that [decedent] contracted fatal cancer from smoking cigarettes'"); *Bailey v. Wyeth, Inc.*, No. MID-L-0999-06, 2008 N.J. Super. Unpub. LEXIS 3004, at *98 (N.J. Super. Ct. Law Div. July 11, 2008) (finding that PLA subsumed fraud claims when the plaintiffs sought damages based on medical problems caused by ingestion of the defendant's drug).

The relevant New Jersey Supreme Court cases are not to the contrary. In *Lead Paint*, several municipalities asserted a public nuisance claim against manufacturers of lead paint. The plaintiffs sought to recover (1) the cost of detecting and removing lead paint from buildings; (2) the cost of providing medical care to residents affected by lead poisoning; and (3) the cost of developing programs to educate residents about the dangers of lead paint. *Lead Paint*, 924 A.2d at 486.

The court held that the nuisance claim must be dismissed, because the plaintiffs' claims were only cognizable under the PLA. The court stated that the "essential nature" of the claims involved products liability. *Id.* at 503. This was because "the harms plaintiffs [sought] to vindicate . . . [were] addressed in the context of a products liability claim," including "'physical damage to property[,] . . . personal physical illness [or] injury,' and the like." *Id.* (quoting N.J. Stat. Ann. § 2A:58C-1(b)(2)) (last two alterations in original). The court further explained:

> The central focus of plaintiffs' complaints is that defendants were aware of dangers associated with lead – and by extension, with the dangers of including it in paint intended to be used in homes and businesses – and failed to warn of those dangers. This classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA.

*Id.*

The next year, the New Jersey Supreme Court decided *Sinclair*. In that case, the plaintiffs alleged that, because they took the arthritis drug Vioxx, they were at "enhanced risk of serious undiagnosed and unrecognized myocardial infarction, commonly referred to as 'silent heart attack,' and other latent and unrecognized injuries." 948 A.2d at 589. The plaintiffs asserted claims against the drug manufacturer under both the PLA and the CFA, and they sought to recover the cost of diagnostic testing and medical monitoring to ensure that they did not suffer from these latent injuries. *Id.* at 589-90.

The court held that the plaintiffs' PLA claims were not viable, because they had not suffered a physical injury and thus had not suffered "harm" as defined by the statute. *Id.* at 595. It further held, citing *Lead Paint*, that the plaintiffs' CFA claims must be dismissed, because those claims were subsumed by the PLA:

> The language of the PLA represents a clear legislative intent that, despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. *The heart of plaintiffs' case is the potential for harm caused by Merck's drug.* It is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope. Consequently, plaintiffs may not maintain a CFA claim.

*Id.* at 596 (emphasis added).

In both *Lead Paint* and *Sinclair*, the damages that the plaintiffs sought to recover were directly based on personal injuries caused by the defendants' products. The *Lead Paint* plaintiffs sought damages for the cost of treating lead poisoning, and the *Sinclair* plaintiffs sought medical monitoring to discover whether they were afflicted with any latent health problems. *See also McDarby v. Merck & Co., Inc.*, 949 A.2d 223, 278 (N.J. Super. Ct. App. Div. 2008) (dismissing

CFA claim when the plaintiff sought recovery of losses "'deriving from' personal physical illness, injury or death, pain and suffering, mental anguish or emotional harm, and loss of consortium"). In those cases, the gravamen of the claims was that the products had actually caused physical harm.

Here, in contrast, the gravamen of the plaintiff's claim is that he would not have spent money purchasing the F50F if the defendant had not made certain misrepresentations and omissions. The damages that the plaintiff seeks are not directly related to any particular instance of physical injury or property damage caused by the F50F; unlike in *Lead Paint*, the plaintiff is not seeking "to vindicate . . . harms includ[ing] 'physical damage to property[,] . . . personal physical illness [or] injury." 924 A.2d at 503. Theoretically, it is not necessary that the plaintiff, or any other class member, ever actually suffered physical harm from the air cleaner's ozone production. In other words, the "essential nature" of the plaintiff's claims is fraud, not products liability. Thus, the claims fall outside of the scope of the PLA.[8] *See Zafarana v. Pfizer Inc.*, 724

---

[8] The court acknowledges that, in analogous situations, some lower courts have reached the opposite conclusion. For example, in *DeBenedetto v. Denny's, Inc.*, No. A-4135-09T1, 2011 N.J. Super. Unpub. LEXIS 63 (N.J. Super. Ct. App. Div. Jan. 11, 2011), the plaintiff asserted a CFA claim and sought to recover money spent on high-sodium meals, claiming that he would not have bought the food if the defendant had disclosed the food's sodium content and had warned of the dangers of excessive sodium consumption. *Id.* at *1-3. The plaintiff did not allege that he had suffered any physical harm from the food. Regardless, the court, citing *Lead Paint* and *Sinclair*, found that this was a "claim[] for 'harm caused by a product'"and was therefore subsumed by the PLA. *Id.* at *8-9. The court did not, however, explain how the food had caused the harm complained of by the plaintiff. Notably, the *DeBenedetto* opinion was unpublished, and New Jersey court rules provide that "[n]o unpublished opinion shall constitute precedent or be binding upon any court." N.J. Court R. 1:36-3.

Similarly, in *Fellner v. Tri-Union Seafoods, L.L.C.*, No. 06-CV-0688, 2010 U.S. Dist. LEXIS 36195 (D.N.J. Apr. 13, 2010), the plaintiff brought a CFA claim and alleged that she would not have purchased the defendant's tuna if the defendant had warned about the dangers of

F. Supp. 2d 545, 555 (E.D. Pa. 2010) (holding that the PLA did not subsume a CFA claim

seeking recovery of the purchase price of drugs when the defendant's misleading marketing led

_____

mercury. *Id.* at *12. The plaintiff also brought a PLA claim, alleging that she had actually suffered mercury poisoning after eating the tuna. The plaintiff argued that "the economic damages [attributable to purchasing the tuna] [did] not result from a harm caused by the product (in contrast with her physical/mental damages), and therefore [were] not covered by the PLA." *Id.* at *13.

The district court, citing *Lead Paint* and *Sinclair*, rejected this argument, finding that "[t]he fact that Plaintiff . . . seeks economic damages to reimburse her for the cost of the product (in addition to personal injury damages) does not change the fact that this is, in essence, a product liabilities claim." *Id.* at *15. Of course, the PLA defines a "product liabilit[ies]" claim as one for "harm caused by a product." N.J. Stat. Ann. § 2A:58C-1(b)(3). Again, the court did not explain how the harm of purchasing a product can be "caused by" the product itself, when the harm is necessarily suffered, in full, before the plaintiff uses or consumes the product.

Finally, in *Nafar v. Hollywood Tanning Systems*, 2010 U.S. Dist. LEXIS 65183 (D.N.J. June 30, 2010), the plaintiff alleged that, if the defendant tanning salon had properly disclosed the potential dangers of tanning, she would not have purchased their tanning services. *Id.* at *7. The plaintiff did not seek damages for any physical injuries. The district court held that her claims were subsumed by the PLA: "It is [the] 'potential' for future physical harm that is the basis for Plaintiff's economic damages (that is, her purchase would not have been economically harmful to her absent the potential for future physical harm)." *Id.* at *32; *see also O'Donnell v. Kraft Foods, Inc.*, No. 09-4448, 2010 U.S. Dist. LEXIS 26023, at *8-9 (D.N.J. Mar. 18, 2010) (reaching a similar conclusion).

This court finds this reasoning unpersuasive. It is certainly true that, in both *Nafar* and in the instant case, the defendants' alleged omissions dealt with the products' potential to cause physical harm. But this does not mean that the product "caused" the relevant harm (that is, the plaintiffs' decision to purchase the products) in any meaningful way. This overbroad concept of causation would require the dismissal of *any* CFA claim regarding the purchase of a product, because every purchasing decision is in some sense "caused" by the product. This is not the law. *See, e.g.*, *Lee v. Carter-Reed Co., L.L.C.*, 4 A.3d 561, 579 (N.J. 2010) (permitting a CFA claim that was based on fraudulent statements regarding the efficacy of a diet pill and that sought recovery of purchase price). Instead, it is more accurate to say that the harm was caused by the defendant's misrepresentations or omissions. Notably, even cases finding that fraudulent omission claims are subsumed by the PLA would permit claims based on affirmative misrepresentations to go forward. *See, e.g.*, *Nafar,* 2010 U.S. Dist. LEXIS 65183, at *32; *DiBenedetto*, 2011 N.J. Super. Unpub. LEXIS 63, at *4; *Rodnite v. Hovnanian Enters.*, No. 08-3787, 2010 U.S. Dist. LEXIS 79091, at *12-13 (D.N.J. Aug. 5, 2010).

Because the court finds these non-binding cases unpersuasive, it declines to follow them.

to the plaintiffs' expenditures); *Estate of Knoster v. Ford Motor Co.*, 200 Fed. Appx. 106, 116 (3d Cir. 2006) (holding that the PLA did not subsume claims seeking damages for harm outside of the PLA's statutory definition of "harm").

Accordingly, the court finds that the PLA does not subsume any of the plaintiff's claims.

## III. Express Warranty Claim

Next, the defendant argues that the plaintiff's warranty claims must be dismissed. The plaintiff has asserted a claim for breach of express warranty, pursuant to N.J. Stat. Ann. § 12A:2-313. The F50F owner's guide states that "Honeywell warrants this product to be free from defects in the workmanship or materials, under normal use and service, for a period of five (5) years from the date of purchase by the consumer."[9] (Docket No. 13, Ex. 3 at 16.)

Specifically, the defendant argues that the plaintiff has failed to sufficiently allege that any express warranty formed a part of the basis of the bargain between him and Honeywell. (*Id.*, Ex. 1 at 22-23.) An express warranty is created only when a manufacturer's statement "becomes part of the basis of the bargain." N.J. Stat. Ann. § 12A:2-313(1)(a).

"[A] plaintiff effectuates the 'basis of the bargain' requirement of section 2-313 by proving that she read, heard, saw or knew of the [document] containing the affirmation of fact or promise." *Cipollone v. Liggett Group, Inc.*, 893 F.2d 541, 567 (3d Cir. 1990), *rev'd in part on other grounds*, 505 U.S. 504 (1992). "Under New Jersey law, a representation is presumed to be

---

[9] In support of its motion, the defendant has submitted a copy of the F50F Owner's Guide. (Docket No. 13, Ex. 3.) The court will consider this document because the plaintiff's Complaint explicitly references and quotes this guide. (*E.g.*, Docket No. 1 ¶¶ 13, 45.) On a motion to dismiss, the court may consider "documents incorporated into the complaint by reference." *Bowers v. Wynne*, 615 F.3d 455, 470 (6th Cir. 2010).

part of the basis of the bargain 'once the buyer has become aware of the affirmation of fact or promise.'" *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 469 (D.N.J. 2007) (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 825 (3d Cir. 1999)) (quotation marks omitted).  Although there is no precise time when the affirmation must have been made, the express warranty must "fairly . . . be regarded as part of the contract."[10] *Liberty Lincoln-Mercury*, 171 F.3d at 825 (quoting N.J. Stat. Ann. § 12A:2-313 cmt. 7).

Here, the Complaint does not allege that the plaintiff read the owner's guide, or otherwise saw the express warranty, before buying the F50F.  Instead, it alleges that the plaintiff "carefully reviewed the manual" after installing the air cleaner.  (Docket No. 1 ¶ 14.)  By that time, the bargain between the plaintiff and the defendant had already been made.  The commercial relationship between the parties was completed, and the warranty could not reasonably be considered a part of their contract.  *See Bearden III*, 2010 U.S. Dist. LEXIS 83996, at *14 (applying Tennessee's identically worded statute and holding that "the plaintiff must have been aware of the warranty and must have relied on it when deciding to purchase the product").  Thus, the court will dismiss the plaintiff's claim for breach of express warranty.

## IV.     Magnuson-Moss Warranty Act Claim

The defendant argues that, because the plaintiff's express-warranty claim has been dismissed, his claim under the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C.

---

[10] The official comment to the statute further states: "If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification [to the contract] . . . ."  N.J. Stat. Ann. § 12A:2-313 cmt. 7. Here, the plaintiff did nothing analogous to asking for additional assurances, and his awareness of the express warranty came after the product had already been delivered.

2301 *et seq.*, must also be dismissed.  (Docket No. 13, Ex. 1 at 12.)

This court rejected an identical argument in *Bearden*.  *Bearden III*, 2010 U.S. Dist. LEXIS 83996, at \*16-18.  Section 2310 of the MMWA permits "a consumer who is damaged by the failure of a . . . warrantor . . . to comply with . . . a written warranty" to bring a suit for damages.  15 U.S.C. § 2310(d)(1).  The statute contains two alternative definitions for "written warranty":

> (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
>
> (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

*Id.* § 2301(6).

The first definition, which applies to the warranty in the F50F owner's guide, does not require that the warranty be "part of the basis of the bargain" between the seller and the buyer. Because this definition is broader than the definition of "express warranty" under New Jersey law, *compare id. with* N.J. Stat. Ann. § 12A:2-313(1)(a), the plaintiff's MMWA claim does not fail simply because his state-law express warranty claim fails.[11]

---

[11] This contrasts with the MMWA's definition of "implied warranty," which expressly incorporates state law.  15 U.S.C. § 2301(7) (defining "implied warranty" as "an implied

The defendant also argues that the plaintiff has not alleged a manufacturing defect, which is covered by the written warranty, as opposed to a design defect.  (Docket No. 13, Ex. 1 at 22.)  Again, in *Bearden*, this court rejected that argument:

> [T]he central allegation in this case is that the F300 produces an excessive amount of ozone.  The complaint does not foreclose the possibility that this overproduction is caused by some sort of persistent manufacturing defect.  Although it is true that much of the complaint is premised on the allegation that the F300 is defectively designed, a plaintiff is allowed to plead claims in the alternative.  *See* Fed. R. Civ. P. 8(d)(2); *see also Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *17 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives.").  The exact nature of the alleged defects will become clearer after discovery.

*Bearden III*, 2010 U.S. Dist. LEXIS 83996, at *18-19.

Accordingly, the court will not dismiss the plaintiff's individual MMWA claim.

## V.  Implied Warranty Claim

The plaintiff also asserts a claim for breach of implied warranty, pursuant to N.J. Stat. Ann. § 12A:2-314, alleging that the defendant breached an implied warranty of merchantability.  Honeywell argues that it has disclaimed any implied warranties.  (Docket No. 13, Ex. 1 at 27-28.)

Under New Jersey law, implied warranties can be disclaimed by "conspicuous" disclaiming language.  N.J. Stat. Ann. § 12A:2-316(2); *Viking Yacht*, 496 F. Supp. 2d at 471.

---

warranty arising under State law").

Language is "conspicuous" if "it is so written that a reasonable person against whom it is to operate ought to have noticed it."  N.J. Stat. Ann. § 12A:1-201(10).  Printing "in capitals" is conspicuous, as is language that is in "contrasting type."  *Id.*

Here, on the same page containing the five-year limited warranty, the owner's guide states:

> THE WARRANTIES SET FORTH HEREIN ARE EXCLUSIVE, AND HONEYWELL EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY, WORKMANSHIP, OR FITNESS FOR A PARTICULAR PURPOSE.

(Docket No. 13, Ex. 3 at 16.)

The plaintiff argues that this paragraph is inconspicuous.  (Docket No. 38 at 14-15.)  He attempts to contrast the defendant's disclaimer with the disclaimer in *Viking Yacht*, which was printed under a heading titled "DISCLAIMER AND LIMITATION OF LIABILITY."  496 F. Supp. 2d at 471.  Although the instant disclaimer is not printed under a heading that includes the word "disclaimer," it is printed on the page that contains information regarding Honeywell's express warranty, under the large-type heading "*LIMITED* FIVE-YEAR WARRANTY." (Docket No. 13, Ex. 3 at 16 (emphasis added).)  A consumer seeking information about the limitations of the defendant's warranties would reasonably expect to find such information under that heading.  More important, the disclaimer is printed in capital letters and is set off in its own paragraph.  Contrary to the plaintiff's suggestion, this language is conspicuous.  *Cf. Carter v. Exxon Co. USA*, 177 F.3d 197, 207 (3d Cir. 1999) (finding that a disclaimer was not conspicuous when it was not capitalized and came at the end of a long paragraph).

Because the defendant has sufficiently disclaimed any implied warranties, the court will dismiss the plaintiff's claim for breach of implied warranty.

## VI.  Motion to Strike

Finally, the defendant argues that the plaintiff's class claims should be stricken, pursuant to Federal Rule of Civil Procedure 12(f).  (Docket No. 13, Ex. 1 at 24-48.)

Federal Rule of Civil Procedure 23 governs class actions, and it requires a plaintiff seeking class certification to show that:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition, for a Rule 23(b)(3) class action, the plaintiff must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.* 23(b)(3).

Rule 12(f) permits the court to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading.  *Id.* 12(f).  As this court noted in *Bearden*, "there is precedent for treating a Rule 12(f) motion to strike class allegations as a motion to deny class certification under Rule 23."  *Bearden II*, 720 F. Supp. 2d at 942 (citing *Smith v. Bayer Corp. (In re Baycol Prods. Litig.)*, 593 F.3d 716, 721 n.2 (8th Cir. 2010)).  "Under Rules 23(c)(1)(A) and

23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained." *Hovsepian v. Apple, Inc.*, No. 08-5788, 2009 U.S. Dist. LEXIS 117562, at *5 (N.D. Cal. Dec. 17, 2009). For example, if the complaint shows that individual questions will necessarily predominate, the court can strike the class allegations. *See Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83972, at *15-16 (N.D. Ohio Nov. 17, 2006) (striking class allegations because claims would require individualized inquiry).

This court further explained:

> Rule 23 allows the court to "require that the pleadings be amended to eliminate allegations about representation of absent persons." Fed. R. Civ. P. 23(d)(1)(D). It also provides that a court must rule on class certification "[a]t an early practicable time," *id.* 23(c)(1)(A), and "[n]othing in the plain language of [the rule] either vests plaintiffs with the exclusive right to put the class certification issue before the district court or prohibits a defendant from seeking early resolution of the class certification question." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939-40 (9th Cir. 2009).
>
> The Sixth Circuit has stated that a district court should defer decision on class certification issues and allow discovery "if the existing record is inadequate for resolving the relevant issues." *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996) (citation omitted). This general rule does not apply if it is clear from the face of the complaint that a proposed class cannot satisfy the requirements of Rule 23. But if "there has not been class discovery . . . nor extensive briefing on class issues," it is appropriate to defer decision on reasonably contested class issues. *In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*, No. 3:02-md-1457, 2008 U.S. Dist. LEXIS 107132, at *34 (M.D. Tenn. Nov. 14, 2008).

*Bearden II*, 720 F. Supp. 2d at 942 (citation omitted).

As an initial matter, the court notes that the plaintiff cannot act as a class representative for claims that he, as an individual, cannot maintain.  Fed. R. Civ. P. 23(a)(3) (typicality requirement); *In re Am. Med. Sys.*, 75 F.3d at 1082 (holding that the named plaintiff's claim must be "based on the same legal theory" as the class claims).  Because the court has dismissed the plaintiff's individual claims for breach of express warranty and breach of implied warranty, the plaintiff cannot maintain those claims on behalf of the putative class.

### A.      Unjust Enrichment

The parties dispute whether the plaintiff's unjust enrichment claim can be maintained on a class-wide basis.  "Under New Jersey law, a claim of unjust enrichment has two essential elements: (1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable."  *United States v. Albinson*, No. 09-1791, 2010 U.S. Dist. LEXIS 83644, at *53 (D.N.J. Aug. 16, 2010) (citing *Wanaque Borough Sewerage Auth. v. West Milford*, 144 N.J. 564, 575 (N.J. 1996)).  The defendant argues that class treatment is improper because individualized inquiries regarding each class member will predominate.  (Docket No. 13, Ex. 1 at 40-41.)

This court addressed the same argument in *Bearden*.[12]  In that case, the putative class was limited to people who had purchased air cleaners but had suffered no physical injury.  The court

---

[12] Although *Bearden* involved Tennessee law, Tennessee and New Jersey require effectively identical elements for an unjust enrichment claim.  *See Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (requiring "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." (quotation marks omitted) (alteration in original)).

found that individualized inquiries would necessarily predominate:

> [T]here are undoubtedly many . . . class members who are satisfied with their F300s, or who are at least not bothered by its ozone output. Allowing the defendant to retain its profits from sales to those class members is not inequitable; for their money, the consumers received a product that met their expectations and performed adequately. It is clear, then, that resolution of the unjust enrichment claim will depend on the specific facts of each class member's transaction.

*Bearden I*, 2010 U.S. Dist. LEXIS 28331, at *33.

Here, the putative class includes all purchasers of F50F and F300 air cleaners, regardless of whether they suffered physical injury. Because this class is even wider than the *Bearden* class, class members' situations will be even more diverse, and individualized inquiries will become even more necessary. Accordingly, the court will strike the class allegations from the plaintiff's unjust enrichment claim.

**B.    Fraud Claims**

Next, the defendant argues that individual issues regarding reliance will predominate the plaintiff's CFA and common-law fraud claims. (Docket No. 13, Ex. 1 at 34-38.) This court rejected that argument in *Bearden*:

> Whether individualized inquiry is necessary to determine whether class members would not have bought the F300 but for the alleged fraudulent concealment depends on, among other things, the amount of ozone the F300 [actually] emits and the warnings that the defendant should have disclosed. For example, if the evidence ultimately shows that the F300 emits a large amount of ozone, that a relatively large portion of the population is sensitive to ozone exposure, that such exposure can cause grievous physical consequences, and that Honeywell should have conspicuously disclosed all of this to purchasers, it is possible that individualized inquiry will not be required. Discovery and further briefing are

thus necessary . . . .

> Although courts often find that individual questions predominate fraud and fraudulent concealment claims, this is not always the case. *See, e.g.*, *Mell v. Anthem, Inc.*, 264 F.R.D. 312, 321 (S.D. Ohio 2009) (certifying a class over the defendants' objections that individualized reliance issues would predominate); *Stanich v. Travelers Indem. Co.*, 249 F.R.D. 506, 518 (N.D. Ohio 2008) ("Where there are uniform presentations of allegedly misleading information, or common omissions throughout the entire class, especially through form documents, courts have found that the element of reliance may be presumed class-wide, thereby obviating the need for an individualized inquiry of each class member's reliance."). . . . [D]iscovery will allow the court to assess whether individual reliance is at the factual core of the instant plaintiffs' fraud claims.

*Bearden II*, 720 F. Supp. 2d at 944-45 (citation and footnote omitted); *see also Lee v.*

*Carter-Reed Co., L.L.C.*, 4 A.3d 561, 579-80 (N.J. 2010) (certifying CFA class over objections

regarding predominance). Furthermore, the court distinguished the fraud claims, which it did not

strike, from the unjust enrichment claims, which it did:

> [I]t can simultaneously be true that: (1) a given consumer has been satisfied with the performance of his F300, and (2) the consumer would not have bought the F300 in the first place, had he known that it emits a high level of ozone and that ozone is a severe health risk to a portion of the population. This consumer would not have a viable unjust enrichment claim, because his satisfaction with the F300 makes it not inequitable for the defendant to retain its profits. But it is not obvious that the consumer . . . lacks standing to pursue a fraud claim.

*Bearden II*, 720 F. Supp. 2d at 943.

For the same reasons, the court will defer resolving the viability of the instant plaintiff's

class-wide fraud claims until the class-certification stage.[13]

### C.    Magnuson-Moss Warranty Act Claim

Finally, the defendant argues that the plaintiff did not satisfy the statutory prerequisites

for bringing a class claim under the MMWA.  (Docket No. 13, Ex. 1 at 41-44.)

The MMWA requires potential class-action plaintiffs to give the defendant notice that

they intend to bring suit on behalf of a class:

> No action . . . may be brought under subsection (d) for failure to
> comply with any obligation under any written or implied warranty
> . . ., and a class of consumers may not proceed in a class action
> under such subsection . . ., unless the [defendant] is afforded a
> reasonable opportunity to cure such failure to comply.  In the case
> of such a class action . . ., such reasonable opportunity *will be
> afforded by the named plaintiffs* and they *shall at that time notify
> the defendant that they are acting on behalf of the class.*

15 U.S.C. § 2310(e) (emphasis added).

As the court previously noted in *Bearden*, the language of the statute is mandatory: a

class action "may not proceed" unless the pre-suit notice requirement is met; such notice "*will* be

afforded by the named plaintiffs"; and, at that time, the named plaintiffs "*shall* . . . notify the

defendant that they are acting on behalf of the class."  *Id.* (emphasis added); *Bearden I*, 2010

U.S. Dist. LEXIS 28331, at *24-26.  At least one other district court has dismissed a

Magnuson-Moss claim because the plaintiffs failed to notify the defendant that they were

representing a class.  *Stearns v. Select Comfort Retail Corp.*, No. 08-2746, 2009 U.S. Dist.

---

[13] The defendant also argues that a nationwide class will be unmanageable, because the
laws of the various states conflict.  (Docket No. 13, Ex. 1 at 44-48.)  This is an argument better
suited for the class certification stage.  *See Bearden II*, 720 F. Supp. 2d at 945.  It is possible, of
course, that the court will ultimately limit the class to New Jersey residents.

LEXIS 112971, at *32-33 (N.D. Cal. Dec. 4, 2009) ("Plaintiffs once again have failed to allege that they provided adequate notice to Select Comfort that they were acting on behalf of the class prior to filing suit.").

Here, the plaintiff has not alleged that he notified the defendant that he planned to bring a class-action MMWA claim. Instead, the Complaint alleges that, because Honeywell had already been sued by similar plaintiffs, the defendant had "actual notice of both claims by purchasers and claims on behalf of the class of purchasers." (Docket No. 1 ¶ 161.) Similarly, in his brief, the plaintiff argues that the defendant received notice via the *Bearden* suit. (Docket No. 38, Ex. 1 at 17.) But the statute explicitly requires the "named plaintiff[]" himself to give pre-suit notice of a class-wide claim. 15 U.S.C. § 2310(e). Because the plaintiff did not do so, he cannot maintain his MMWA claim on behalf of the class.[14] The court will strike the class allegations from that claim.

## CONCLUSION

----

[14] The plaintiff claims that this construction of the MMWA's pre-suit notice requirement in incorrect. (Docket No. 38 at 17 n.5.) He argues that a manufacturer receives the required "opportunity to cure" if it knew of the product's defects at the time of sale and that, in that instance, the plaintiff need not give notice. (*Id.*)

But two of the cases cited by the plaintiff involved individual MMWA claims, not class claims. *McFadden v. Dryvit Sys.*, No. CV-04-103-ST, 2004 U.S. Dist. LEXIS 20604, at *45-47 (D. Or. 2004); *Radford v. Daimler Chrysler Corp.*, 168 F. Supp. 2d 751, 753-54 (N.D. Ohio 2001). The MMWA sets a lower bar for individual claims – it only requires that the manufacturer "[be] afforded a reasonable opportunity to cure such failure to comply [with the warranty]." 15 U.S.C. § 2310(e). For class actions, however, the statute specifically requires that the opportunity to cure "will be afforded by the named plaintiffs" and that the named plaintiffs "shall . . . notify the defendant that they are acting on behalf of the class." *Id.* The third case cited by the plaintiff, *Alberti v. General Motors Corp.*, 600 F. Supp. 1026, 1028 n.2 (D.D.C. 1985), fails to address this statutory language.

For all of the reasons discussed above, the defendant's Motion to Dismiss and to Strike will be granted in part and denied in part. The plaintiff's claims for breach of implied warranty and breach of express warranty will be dismissed. References to the putative class or to putative class members will be stricken from the plaintiff's MMWA and unjust enrichment claims.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge