UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PAUL REHBERGER,           )
                          )
    Plaintiff,            )
v.                        )    No. 3:11-cv-0085
                          )    Judge Sharp
HONEYWELL INTERNATIONAL, INC., )
                          )
    Defendant.            )

# MEMORANDUM

Pending before the Court is Defendant's *Motion for Summary Judgment* (Docket Entry No. 116), to which Plaintiff filed a response in opposition (Docket Entry No. 134) and Defendant filed a reply (Docket Entry No. 148).[1]

# RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff, Paul Rehberger ("Plaintiff" or "Rehberger") purchased a model F50F in-duct electronic air cleaner, manufactured by Honeywell International, Inc. ("Defendant" or "Honeywell") in 2004 from Ferguson's Plumbing.[2] Shortly after purchasing the air cleaner, Plaintiff installed it himself. He purchased the air cleaner without reading any Honeywell product literature but did read the manual before installing the cleaner in his home. One reason he selected a Honeywell air cleaner was because Honeywell was the dominant brand he saw being installed in homes.

---

[1] Plaintiff initially filed this suit on November 4, 2010 in the United States District Court for the District of New Jersey. On January 28, 2011, the parties consented to an Order transferring the case to this Court, pursuant to 28 U.S.C. § 1404(a). (Docket Entry No. 24).

[2] Unless otherwise noted, the facts are drawn from the parties' statements of material facts and related declarations and exhibits. Based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

1

After running the unit for approximately one year, Plaintiff and his family noticed a strange odor, which they attributed to the house. They also began to suffer various respiratory illnesses.[3] In 2010, Plaintiff discovered that, if he ran the F50F air cleaner without the removable cells, the odor disappeared. Since then, Plaintiff has used a paper filter in the F50F, and his family's health issues have subsided. At that time, Plaintiff again read the product manual, and it was clear to him that the air cleaner produced ozone.

Whole-house electronic air cleaners such as the F50F clean and filter the air by capturing airborne particles that pass through the air cleaner. The F50F includes electronic cells that use electricity to charge the particles in the air so that they may be collected by collector plates with an opposite electric charge. When electricity interacts with oxygen, ozone can be created as an incidental byproduct. The F50F is packaged with a product data sheet that states that the air cleaner produces between 5 and 10 ppb of ozone; these numbers are repeated in the F50F owner's guide. The product data sheet notes that the U.S. Food and Drug Administration recommends that indoor ozone concentration should not exceed 50 ppb. Ozone exists everywhere. Ozone exists in ambient air, both indoors and outdoors.

Plaintiff's sole expert, industrial hygienist Patrick Rafferty, conducted testing of Plaintiff's air cleaner in January 2013. During Mr. Rafferty's testing, Plaintiff's air cleaner ran for 3.5 hours without an observable increase in ozone concentrations. In order to measure ozone potentially contributed to the air by Plaintiff's air cleaner, Plaintiff's expert first took "background" measurements without the air cleaners operating. Plaintiff's expert measured background ozone levels ranging from 1.9 ppb to 4.3 ppb without Plaintiff's air cleaner operating. Plaintiff's expert measured ozone from all sources, including the air cleaner, and reported measurements ranging from 1.6 ppb to 13.5 ppb. Ultimately, Rafferty concluded the

---

[3] Plaintiff is not seeking damages for his personal injuries in this case.

"findings in this study are consistent with other [] testing that has shown ozone concentrations in excess of 10 ppb above average background when Honeywell EACs are in use . . .".

## ANALYSIS

**I.      Summary Judgment Standard**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable

inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

II.     **Motion for Summary Judgment**

   **A. Fraud Claims**

Plaintiff has brought claims against Defendant for fraud, fraud by omission, and negligent misrepresentation. In order to prevail on a common law fraud claim, a plaintiff must show that a defendant: (1) made a representation or omission of a material fact; (2) with knowledge of its falsity; (3) intending that the representation or omission be relied upon; (4) which resulted in reasonable reliance; and that (5) plaintiff suffered damages. *Depolink Court Reporting & Litig. Servs. v. Rochman,* 430 *N.J.Super.* 325, 333 (App.Div. 2013) (citing *Jewish Ctr. of Sussex Cnty. v. Whale,* 86 *N.J.* 619, 624, 432 *A.*2d 521 (1981)). Plaintiff must prove each element by "clear and convincing evidence." *Stochastic Decisions, Inc. v. DiDomenico, 236 N.J.Super.* 388, 395, 565 A.2d 1133 (App.Div. 1989), *certif. denied,* 121 *N.J.* 607, 583 *A.*2d 309 (1990). Plaintiff's claim for fraud by omission requires the common-law fraud elements and, in addition, a duty to disclose the allegedly withheld information. *United Jersey Bank v. Kensey*, 704 A.2d 38, 43-44 (N.J. Super. Ct. App. Div. 1997).

Negligent misrepresentation is "'[a]n incorrect statement, negligently made and justifiably relied upon, [and] may be the basis for recovery of damages for economic loss ... sustained as a consequence of that reliance.'" *Green v. Morgan Props.,* 215 *N.J.* 431, 457 (2013) (quoting *H. Rosenblum, Inc. v. Adler,* 93 *N.J.* 324, 334 (1983), *superseded on other grounds, N.J.S.A.* 2A:53A–25). In order to sustain a cause of action based on negligent misrepresentation, the plaintiff must establish that the defendant negligently made an incorrect statement of a past or existing fact, that the plaintiff justifiably relied on it and that his or her reliance caused a loss

or injury. *Kaufman, supra,* 165 *N.J.* at 109 (finding that the "element of reliance is the same for fraud and negligent misrepresentation"). The principle of indirect reliance applies to negligent misrepresentation as well as fraud. *Id.* at 108–09.

Defendant insists that Plaintiff's testing confirms that Honeywell did not make a material misrepresentation about the F50F air cleaner. Defendant continues,

> Honeywell disclosed to Plaintiff that the F50F emits about 5–10 ppb ozone. (ECF No. 88-4 at 13.) In testing the F50F, Plaintiff's expert industrial hygienist measured a peak ozone level—which contained ozone from all sources—of 13.5 ppb. (Rafferty Rep. at 9.) Plaintiff's expert also measured a peak background ozone reading—when the air cleaner was not operating—of 4.3 ppb. (Rafferty Rep. at 10; Rafferty Dep. at 159:10–23.) Subtracting the peak background from the peak total concentration results in a net contribution of just 9.2 ppb, which is squarely within Honeywell's representation. Indeed, for every one of Mr. Rafferty's 1,398 measurements, subtracting the peak background level yields a result below ten.
>
> At his deposition, Mr. Rafferty suggested that the average of his background measurements should be subtracted, rather than the peak background level. (Rafferty Dep. at 177:8–25.) If so, Honeywell's representation remains true. Mr. Rafferty testified that the average background ozone level in the Rehberger home was 2.95 ppb. (*Id.* at 173:24–174:25.) Subtracting the background 2.95 ppb from his single peak reading of 13.5 ppb yields a maximum of 10.5 ppb. (*Id.* at 177:16–25.) Mr. Rafferty agreed that 10.5 ppb is "about" 10 ppb (*id.*), and thus Honeywell's statement that the F50F would emit "about" 5–10 ppb is true.

(Docket Entry No. 117 at 9). Plaintiff counters that he has confirmed that Honeywell's representation that its air cleaners produce five to ten parts-per-billion ozone is false. (Docket Entry No. 134 at 5). Specifically, Plaintiff states,

> Plaintiffs' industrial hygiene expert, Mr. Patrick Rafferty conducted testing at the Rehbergers' home on January 21 and 22, 2013. (Rafferty Report, Ex. B, at 8). Using an ozone monitor described by Honeywell's testing expert as "quite consistent and reliable," Mr. Rafferty tested the Rehbergers' air cleaners when they were running continuously, consistent with both the manufacturer's instructions and the Rehbergers' use for significant periods. (Rafferty Report, Ex. B, at 8). Mr. Rafferty placed a monitor in the Rehbergers' kitchen; the monitors confirmed that the Honeywell air cleaners contributed, over background, above

the "10 parts per billion ozone" represented by Honeywell to be the upper limit for the device's ozone generation. (Product Manual, Ex. L, at BHWL 14895).

Plaintiffs have again confirmed what many earlier tests have shown – that Honeywell's representations significantly understate the ozone produced by its air cleaners.

(*Id.*).

Defendant replies,

Despite the centrality of this issue, Plaintiff's opposition nowhere mentions or attempts to explain this clear testimony. Rather, Plaintiff falsely asserts that Mr. Rafferty reached a different conclusion. For example Plaintiff writes:

Mr. Rafferty's testing very directly corroborates Plaintiffs' [sic] claim that Honeywell's ozone representations in its product literature are false and in and of itself renders Honeywell's Motion for Summary Judgment dead on arrival. (Pl.'s Mem. at 6 (ECF No. 134).) Plaintiff does not cite any record support for this assertion. Even at the highest one-minute ozone reading, Mr. Rafferty testified that—after subtracting background ozone—the ozone contributed by the Honeywell air cleaner was about 10 ppb. (Rafferty Dep. at 177:16–25.)

(Docket Entry No. 148).

Although Plaintiff claims Honeywell's representation is false, it neglects to provide any record support for this assertion. The Court has reviewed the record in this case. Plaintiff's expert report does, indeed, state the "findings in this study are consistent with other [] testing that has shown ozone concentrations in excess of 10 ppb above average background when Honeywell EACs are in use . . ." When questioned in his deposition, Rafferty testified,

Q. So would it be safe to say that -- or true to say that the Rehbergers' F50F contributes on average seven to 10 parts per billion of ozone to the indoor environment above what would be expected without the air cleaners?

A. As a broad generalization, yes. Of course there were peaks that may go – – go beyond that.

(Rafferty Dep. at 219:15–20). There is nothing in the record to negate Honeywell's literature that states its "[e]lectronic air cleaners generate a very small amount of ozone, *about* 0.005 to 0.010 parts per million (ppm)." (emphasis added). Because Plaintiff fails to raise a genuine

6

issue of material fact regarding whether his F50F emits more than "about 5–10 ppb" ozone, summary judgment should be granted in favor of Honeywell on all claims based on alleged affirmative misrepresentation.

Even if the Court were to side with Plaintiff on the element of misrepresentation, Plaintiff still cannot overcome the elements of reliance and proximate cause. The record shows that Plaintiff did not read or review any Honeywell product literature before purchasing his air cleaner. (P. Rehberger Dep. at pp. 65, 67–68, 104, 106, 120, 125). He did not read any Honeywell statement about ozone until 2010, six years after he purchased and installed his air cleaner. (*Id.* at 104, 120). Rehberger testified as follows:

> Q. I'm talking – let's be clear. I want to talk about before you installed –
> A. On, no, no. no. I had no idea.
>
> Q. Okay. Before you installed your air cleaner, did you read anything in the Honeywell manual about ozone?
> A. No.
>
> Q. When [was the] very first time that you ready anything at all from Honeywell regarding ozone?
> A. After I discovered the problem.
>
> Q. In 2010?
> A. Yeah.
>
> Q. Okay. So the very first time you read anything in Honeywell's manual about ozone was in 2010; correct?
> A. Yes.

(P. Rehberger Dep. at 104:2–17). Plaintiff attempts to deflect the fact that he did not read and rely on the allegedly fraudulent statement by arguing,

> Honeywell seeks summary judgment with respect to the Rehbergers' [claims] claims based on its contention that [] Rehberger did not read the Honeywell manual when he purchased his air cleaner. This is simply incorrect. Here is the relevant testimony, elicited from Paul Rehberger by Honeywell's counsel:

> Q: So the first time you would have looked at the manual would have been when you were ready to clean your manual – or clean your unit, correct?
>
> A: No, I – I think I read through it, though, when I first got it just to see what the machine was capable, you know, cleaning and what it did.
>
> (Rehberger Depo., Dkt. No. 119-6, at 103:6-14 (Dkt. #119)). In fact, Paul Rehberger stated that he read the manual every time he cleaned his air cleaners:
>
> Q: Do you recall whether you reviewed the cleaning instructions once or more than once?
>
> A: I think every time I went to clean them I pulled it out because it was pretty explicit directions on how to clean this thing and wanted to make sure I did it right.
>
> (*Id*. at 101:4-9).

(Docket Entry No. 134 at 11).

This argument does not get Plaintiff past the issue of reliance. Even viewing the evidence in the light most favorable to Plaintiff, drawing all justifiable inferences in his favor, the Court finds Plaintiff's fraud claims cannot survive.[4]

**B. NJCFA Claim**

Similar to the above claims, Defendant asserts Plaintiff's claim for violation of the New Jersey Consumer Fraud Act ("NJCFA") should be dismissed because a NJCFA claim "also requires a material misrepresentation" by Honeywell. (Docket Entry No. 117 at 12).

The NJCFA was enacted to "protect against fraudulent and unconscionable practices in the sale of goods and services." *Marascio v. Campanella,* 298 N.J.Super. 491, 500, 689 A.2d 852 (App.Div.1997). The purposes of the NJCFA are: (1) to compensate the victim for his or her

---

[4] In support of his fraud claims, Plaintiff makes the argument that Honeywell has misled consumers by concealing at least two types of material information – first, that a class of consumers are highly sensitive to ozone and cannot tolerate the ozone generated by Honeywell air cleaners and, second, that the levels generated by those devices subjects consumers to an increased risk of death. (Docket Entry No. 134 at 3-4). Unfortunately for Plaintiff, this argument alone, without evidence of reliance, cannot survive.

actual loss; (2) to punish the wrongdoer through the award of treble damages; and (3) to attract competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. *See Lettenmaier v. Lube Connection, Inc.,* 162 N.J. 134, 139, 741 A.2d 591 (1999). The NJCFA is "remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection." *Joe D'Egidio Landscaping v. Apicella,* 337 N.J.Super. 252, 258, 766 A.2d 1164 (App.Div.2001) (citing *Lettenmaier v. Lube Connection, Inc., supra,* 162 N.J. at 139, 741 A.2d 591).

The Legislature enacted the NJCFA in 1960 to give consumers relief from fraudulent practices in the marketplace and to deter merchants from employing those practices. *Cox v. Sears Roebuck & Co.*, 138 N.J.2, 21, 647 A.2d 454 (1994). Today, the NJCFA makes it unlawful for a person to use "any unconscionable commercial practice, deception, fraud, false pretense, false promise [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise. N.J.S.A. 56:8-2. The Act protects against knowing misrepresentations, omissions of material fact, and violations of administrative regulations, whether or not the merchant acts in bad faith. N.J.S.A. 56:8-2; *Cox v. Sears Roebuck & Co.*, *supra*, 138 N.J. at 16-17, 647 A.2d 454; *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605, 691 A.2d 350 (1997).

As the Court stated *supra*, the record in this case along with Plaintiffs' arguments, when construed in a light most favorable to Plaintiffs, fail to create a genuine issue of material fact as to proximate cause for the NJCFA claim.

**C. Unjust Enrichment Claim**

Finally, as Plaintiff contends that Defendant has been unjustly enriched by retaining the economic benefit it received from the F50F sales. According to Plaintiff, "Honeywell's retention of the economic benefit it received violates the fundamental principles of justice . . . because

9

Honeywell knowingly and intentionally concealed the nature and quality of the [F50F], [and] knowingly sold Plaintiff a defective product . . ." (Docket Entry No. 88, Amended Complaint at 27-28).

Under New Jersey law, unjust enrichment can be established by demonstrating that the defendant received a benefit from the plaintiff and that allowing the defendant to keep this benefit would be unjust. *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 641 A.2d 519, 526 (1994). Importantly, any benefit that is conferred must be direct. *Maniscalco v. Brother Int'l Corp.,* 627 F.Supp.2d 494, 506 (D.N.J.2009). There is no separate tort cause of action for unjust enrichment in New Jersey; instead, unjust enrichment provides the underlying logic for several torts, and also provides the basis for establishing quasi-contract liability. *Castro v. NYT Television,* 370 N.J.Super. 282, 851 A.2d 88, 98 (N.J.Super.Ct.App.Div.2004). The Restatement of Torts does not recognize unjust enrichment as an independent tort cause of action. Unjust enrichment is of course a familiar basis for imposition of liability in the law of contracts. *See Restatement (Second) of Contracts* § 345(d) (1981). However, the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion. *See Restatement of Restitution* Ch. 7 (Introductory Note) (1937) (noting that "[t]here are a number of differences between a tort action which, though restitutionary, is based primarily in wrongdoing, and a quasi-contractual action in which the wrong by the defendant is only incidental to his unjust enrichment.").

Here, Plaintiff bases his unjust enrichment claims on the same allegations about fraud that form the basis of his other claims. As such, Plaintiff's unjust enrichment claim will be dismissed.[5]

---

[5] This Court entered a Memorandum Opinion on February 28, 2011, which included a thorough analysis of Plaintiff's claims and concluded his claims fall outside the scope of the New Jersey Product Liability

## CONCLUSION

For all of the reasons stated, the Court will grant Defendant's *Motion for Summary Judgment* (Docket Entry No. 116).[6]

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

Act. *See* (Docket Entry No. 41). Defendant has nevertheless asked this Court to revisit this issue because the Court earlier decided not to rely on a New Jersey state court decision, *DeBenedetto v. Denny's, Inc.*, because it was unpublished – and it has since been published. This Court declines to revisit or overturn its previous rulings in this regard. Nevertheless, considering the Court's ruling on Defendant's instant motion, this argument is moot.

[6] Also pending before the Court is *Honeywell's Motion to Exclude Plaintiff's Proposed Expert Testimony of Mr. Patrick Rafferty, CIH*. (Docket Entry No. 126). This motion will be denied as moot.